No. 2025-1291

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

―――――――――――

CHANDAN STEEL, LTD.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

―――――――――――

On Appeal from the Court of International Trade, in case no. 21-00540, Judge Timothy C. Stanceu.

―――――――――――

## DEFENDANT-APPELLEE'S BRIEF

―――――――――――

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

PATRICIA M. McCARTHY
  *Director*

TARA K. HOGAN
GEOFFREY M. LONG
  *Attorneys, Commercial Litigation Branch*
  *Civil Division, U.S. Department of Justice*
  *P.O. Box 480, Ben Franklin Station*
  *Washington, DC 20044*
  *(202) 307-0159*

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUE ........................................................................ 1

STATEMENT OF THE CASE ........................................................................ 1

I. Overview of the First Administrative Review ........................................ 1

II. Chandan's Responses to Commerce's Questionnaires ........................... 3

    A. Questionnaire Responses Relating to Comparison Market
        Window Period Sales ........................................................................ 3

    B. Questionnaire Responses Relating to CONNUM-Specific Costs ........... 5

    C. Questionnaire Responses Relating to Other Issues .................................. 7

III. Commerce's Preliminary Results ........................................................... 10

    A. Commerce Uses Facts Otherwise Available ............................................ 10

    B. Commerce Applies an Adverse Inference in Selecting From
        Among Facts Otherwise Available ............................................................. 12

    C. Commerce Preliminarily Determines a Rate of 145.25 Percent for
        Chandan ...................................................................................................... 14

IV. Commerce's Final Results ..................................................................... 15

V. The Court of International Trade Sustains Commerce's Final Results as
    to Chandan .................................................................................................. 16

SUMMARY OF ARGUMENT ........................................................................ 18

ARGUMENT ................................................................................................... 20

I. Standard of Review ............................................................................... 20

II. Commerce's Use of Facts Otherwise Available With an Adverse
    Inference Is Supported by Substantial Evidence and in Accordance With
    Law ............................................................................................................. 21

A.    Legal Framework ........................................................................... 21

B.    Substantial Evidence Supports Commerce's Resort to Facts
      Available ..................................................................................... 22

      1.    Chandan Failed to Report Comparison Market Window
            Period Sales ......................................................................... 23

      2.    Chandan Failed to Accurately Report Costs at the
            CONNUM-Specific Level .................................................. 30

      3.    Chandan Failed to Correct Other Deficiencies ..................... 33

C.    Commerce's Decision to Use an Adverse Inference Is Supported
      by Substantial Evidence and in Accordance With Law ............................ 34

III.   Commerce's Use of a Rate From a Prior Segment of the Proceeding Is
       Supported by Substantial Evidence and in Accordance With Law ................... 39

CONCLUSION ............................................................................................ 42

# TABLE OF AUTHORITIES

**Cases:**                                                              **Pages(s)**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
802 F.3d 1339 (Fed. Cir. 2015) ....................................... 37

*Atl. Sugar, Ltd. v. United States,*
744 F.2d 1556 (Fed. Cir. 1984) ....................................... 21

*Bebitz Flanges Works Priv. Ltd. v. United States,*
433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020) ................... 24

*Consolo v. Fed. Mar. Comm'n,*
383 U.S. 607 (1966) ........................................................ 20

*Dandridge v. Williams,*
397 U.S. 471 (1970) ........................................................ 30

*Diamond Sawblades Mfrs. Coal. v. United States,*
986 F.3d 1351 (Fed. 2021) .............................................. 37

*Fujitsu Gen. Ltd. v. United States,*
88 F.3d 1034 (Fed. Cir. 1996) ......................................... 20

*Hyundai Elec. & Energy Sys. v. United States,*
No. 2021-2312, 2022 WL 3273811 (Fed. Cir. Aug. 11, 2022) ................... 37

*Hyundai Electric & Energy Systems Co., Ltd. v. United States,*
15 F.4th 1078 (Fed. Cir. 2021) ........................................ 35

*Maverick Tube Corp. v. United States,*
857 F.3d 1353 (Fed. Cir. 2017) ....................................... 35

*Mukand, Ltd. v. United States,*
767 F.3d 1300 (Fed. Cir. 2014) .................................. 36, 37

*Nippon Steel Corp. v. United States,*
337 F.3d 1373 (Fed. Cir. 2003) ............................ 21, 35, 36

*Nippon Steel Corp. v. United States,*
458 F.3d 1345 (Fed. Cir. 2006) ................................. 20, 22

*Ozdemir Boru San. Ve Tic. Ltd. v. United States*,
273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ................................................... 39

*PAM, S.p.A. v. United States*,
582 F.3d 1336 (Fed. Cir. 2009) ..................................................................20, 41

*Papierfabrik August Koehler Se v. United States*,
843 F.3d 1373 (Fed. Cir. 2016) ......................................................................... 41

*Risen Energy Co. v. United States*,
122 F.4th 1348 (Fed. Cir. 2024) ....................................................................24, 25

*Shandong Huarong Gen. Corp. v. United States*,
159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) ..................................................... 21

*Steel Authority of India, Ltd. v. United States*,
149 F.Supp.2d 921 (Ct. Int'l Trade 2001) ....................................................... 38

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
298 F.3d 1330 (Fed. Cir. 2002) ......................................................................... 41

*Thomson Multimedia Inc. v. United States*,
340 F.3d 1355 (Fed. Cir. 2003) ......................................................................... 30

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009) ............................................................................................ 20

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*,
50 F.4th 98 (Fed. Cir. 2022) ......................................................................5, 20, 37

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*,
652 F.3d 1333 (Fed. Cir. 2011) ....................................................................37, 38

**Statutes:**

19 U.S.C. § 1516a(b)(1)(B) ..................................................................................... 20

19 U.S.C. § 1677e(a) ...................................................................... 2, 10, 21, 34

19 U.S.C. § 1677e(a)(1) .............................................................. 1, 10, 11, 33

19 U.S.C. § 1677e(a)(2)(A) ............................................................................ 33

19 U.S.C. § 1677e(a)(2)(A) ............................................................................ 12

19 U.S.C. § 1677e(a)(2)(B) .................................................................................... 10, 27

19 U.S.C. § 1677e(a)(2)(C) ............................................................................................ 33

19 U.S.C. § 1677e(a)(2)(C) .................................................................................... 10, 12

19 U.S.C. § 1677e(b) ................................................................................... 12, 21, 35, 36

19 U.S.C. § 1677e(b)(1) .......................................................................................... 1, 21

19 U.S.C. § 1677e(b)(1)(B) ............................................................................................ 40

19 U.S.C. § 1677e(b)(2) .................................................................................................. 22

19 U.S.C. § 1677e(c)(2) .................................................................................................. 14

19 U.S.C. § 1677e(d)(1)(B) ..................................................................................... 39, 40

19 U.S.C. § 1677e(d)(2) ........................................................................................... 18, 39

19 U.S.C. § 1677e(d)(3)(A) ............................................................................................ 41

19 U.S.C. § 1677e(d)(3)(B) ............................................................................................ 41

19 U.S.C. § 1677m(e) ...................................................................................................... 27

19 U.S.C. § 1677m(e)(4) .................................................................................................. 27

19 U.S.C. § 1977e(b) ........................................................................................................ 2

**Regulations:**

19 C.F.R. § 351.308(c) .................................................................................................... 22

**Federal Register Notices:**

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 67,712 (Dep't of Commerce Dec. 11, 2019) .................................................................. 2

*Stainless Steel Flanges from India: Antidumping Duty Order*, 83 Fed. Reg. 50,639 (Dep't of Commerce Oct. 9, 2018) .......................................................................................... 2

*Stainless Steel Flanges From India: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 47,619 (Dep't of Commerce Aug. 26, 2021) ........................ 1

*Stainless Steel Flanges from India: Preliminary Results of Antidumping Administrative Review; 2018-2019*, 86 Fed. Reg. 11,231 (Dep't of Commerce Feb. 24, 2021).........................2

**Other Authorities:**

Statement of Administrative Action, H.R. Rep. No. 103-316 (1994), *reprinted at* 1994 U.S.C.C.A.N. 4040..........................................................................................................40

# STATEMENT OF THE ISSUE

This appeal concerns the administrative review of an antidumping duty order. In such reviews, the Department of Commerce may, pursuant to 19 U.S.C. § 1677e(a)(1), select from facts otherwise available to fill gaps where necessary information is missing from the record. Moreover, where a respondent has failed to cooperate by not acting to the best of its ability in responding to Commerce's requests for information, Commerce may apply an adverse inference in selecting from among facts otherwise available. 19 U.S.C. § 1677e(b)(1). The issue presented is whether, in determining the dumping margin applicable to plaintiff-appellant, Chandan Steel, Ltd., Commerce's decision to use an adverse inference when selecting from among the facts otherwise available on the record, and to determine a dumping margin of 145.25 percent, is supported by substantial evidence and otherwise in accordance with law.

# STATEMENT OF THE CASE

## I.     Overview of the First Administrative Review

The administrative determination under review is Commerce's final results in *Stainless Steel Flanges From India: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 47,619 (Dep't of Commerce Aug. 26, 2021), Appx155-157, as further discussed in the accompanying issues and decision memorandum (IDM). Appx106-153. The period of review is March 28, 2018, through September 30, 2019.

In 2018, Commerce issued the antidumping duty order on stainless steel flanges from India. *See Stainless Steel Flanges from India: Antidumping Duty Order*, 83 Fed.

Reg. 50,639 (Dep't of Commerce Oct. 9, 2018).  On December 11, 2019, Commerce initiated the first administrative review.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 67,712 (Dep't of Commerce Dec. 11, 2019), Appx3879-3885.  In March 2020, Commerce selected Chandan as the sole mandatory respondent for the review and issued an initial antidumping questionnaire to Chandan.  Commerce selected Chandan because it was "the producer/exporter accounting for the largest volume of the subject merchandise that could be reasonably examined."  Appx84-85.

Commerce issued its preliminary results for the review on February 24, 2021. *See Stainless Steel Flanges from India: Preliminary Results of Antidumping Administrative Review; 2018-2019*, 86 Fed. Reg. 11,231 (Dep't of Commerce Feb. 24, 2021), Appx102-104, and accompanying preliminary decision memorandum (PDM).  Appx83-100. Commerce issued its final results on August 26, 2021.  In the final results and as discussed further below, Commerce resorted to the use of facts otherwise available, pursuant to 19 U.S.C. § 1677e(a), to fill the gap created on the record by Chandan's failure to provide certain information.  *See* Appx110-127.  Commerce moreover applied an inference adverse to Chandan in selecting from among facts available, pursuant to 19 U.S.C. § 1977e(b).  *See* Appx127-135.  Commerce assigned a dumping margin of 145.25 percent to Chandan's entries for the period of review, which was the highest dumping margin calculated in the petition.  *See* Appx136-138.

## II. Chandan's Responses to Commerce's Questionnaires

### A. Questionnaire Responses Relating to Comparison Market Window Period Sales

During its administrative review, Commerce identified certain deficiencies in Chandan's reporting. The first issue identified related to Chandan's provision of information regarding "window period" sales. In administrative reviews of antidumping duty orders, Commerce typically compares the export price (or constructed export price) of an individual U.S. sale to an average normal value based on a contemporaneous month in a comparison market. Appx113. The preferred month for normal value is the month in which the U.S. sale was made. Appx113. If, during the preferred month, however, there are no sales in the comparison market of a product that is identical to the subject merchandise, Commerce may base normal value on identical or similar sales in a "window period," which extends from three months prior to the month of the U.S. sale in question until two months after the month of the U.S. sale. Appx113. Window period sales information "is critical to Commerce's price-to-price margin calculation, as the best {normal value} 'match' for U.S. sales may be comparison market sales in the window period." Appx113.

To perform the comparison of Chandan's export price to normal value, Commerce requested Chandan to provide all comparison-market sales for three months prior to the earliest U.S. sale and two months after the latest U.S. sale. *See* Appx3925. Despite this request, Chandan reported only the comparison market sales

it made during the POR, and did not include sales during the five-month window period. *See* Appx88 (citing Appx220-233).

After Chandan failed to provide window period sales in its first response, Commerce issued the same instructions in a supplemental questionnaire. *See* Appx88 (citing Appx882-885). On September 11, 2020, Chandan provided the window period information, in a comparison market database titled "CSLHM03." *See* Appx88 (citing Appx988-1152). But while the database CSLHM03 included some window period sales, "Chandan did not include sales of flanges with a nominal pipe size between 0.5 inches and below 1.5 inches in any of its submitted comparison market databases," despite those sizes being subject merchandise. Appx111.

In a second supplemental questionnaire, Commerce requested that Chandan add to its databases all products within the scope of the order, and it also requested revisions to Chandan's reported gross unit price, quantity discount, and other discounts/billing adjustments. *See* Appx1647-1648.

On December 9, 2020, Chandan responded to Commerce's second supplemental questionnaire by providing a second revised comparison market sales database, named "CSLAR1HM03." *See* Appx1661. As with the first version of the database, however, Chandan did not provide window period sales covering the full five-month window period. Appx89 (citing Appx1661-1666 and attached "CSLAR1HM03" comparison market database).

To summarize, in response to Commerce's first request, Chandan submitted a comparison market database lacking the requested window period sales. In response to Commerce's second request, Chandan submitted a comparison market database that included window period sales, but omitted sales of flanges with a nominal pipe size between 0.5 inches and below 1.5 inches, despite those flanges being subject merchandise. And in response to Commerce's third request, Chandan again submitted a database reporting all sizes, but lacking the full five-month period of window period sales.

## B. Questionnaire Responses Relating to CONNUM-Specific Costs

Commerce also sought to secure accurate reporting of Chandan's production costs. Commerce requested information at the control number (CONNUM) level. "'CONNUM' is a contraction of the term 'control number,' and is Commerce jargon for a unique product." *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98, 102 (Fed. Cir. 2022) (citation omitted). Commerce defines CONNUMs by identifying key physical characteristics of the subject merchandise that are commercially meaningful in the United States marketplace and have an impact on costs of production. CONNUM-specific data allows Commerce to perform comparisons of its constructed normal values to export prices on as precise a basis as possible.

Consistent with that practice, Section D of Commerce's initial questionnaire asked Chandan to report per-unit cost-of-production information for each CONNUM included in the comparison-market sales database that Chandan provided in response to Section B of the questionnaire. Appx3998. In response, for its weighted-average costs, Chandan directed Commerce to two exhibits – Exhibit D-24 (cost build up data) and Exhibit D-15 (raw and direct material costs). Appx90; *see* Appx335-336, Appx508-534, Appx819-822. After reviewing Chandan's response, however, Commerce found that: "(1) Exhibit D-24 did not, in fact, include weighted average CONNUM costs, and (2) in comparing Exhibits D-15 and D-24, Chandan's response contained discrepancies in the reported total raw material costs between these two exhibits." Appx90.

Commerce issued a supplemental questionnaire asking Chandan to provide, with respect to Exhibit D-24 (cost build-up data), "a detailed description of how {it} compiled the CONNUM-specific worksheet." Appx892. Commerce further asked Chandan to "provide all source documentation (*i.e.*, documentation generated in the normal course of business) relied on to compile the worksheet." Appx 892. Chandan provided no explanation in its response to this request, instead stating that it was providing source documentation and "resubmitting Exhibit D-24 as Exhibit D-39 to provide information consistent with that provided in other parts of Chandan's questionnaire response." Appx1172. However, the two exhibits were identical,

6

meaning that Exhibit D-39 did not resolve the issues Commerce had identified with Exhibit D-24.  Appx90.

Commerce again asked Chandan to explain how it compiled the CONNUM-specific cost build-up data spreadsheet, Exhibit D-39, and again requested source documentation.  Appx1653.  In response, Chandan explained that it compiled Exhibit D-39 (formerly Exhibit D-24) "based on the product drawings and the cycle times that are defined for production of these products."  Appx2191.  Chandan also revised Exhibit D-39 to become Exhibit D-56.  Appx2191.

Although Chandan claimed that it derived its cost build-up data from product drawings, Commerce found that the theoretical weights reported in most of the product drawings for CONNUM A and CONNUM B – the CONNUMs with the highest volume of sales in the two respective markets – did not tie to the theoretical weights reported by Chandan in its cost database.  Appx117.  In addition to this discrepancy, Chandan did not provide weighted-average-cost calculation worksheets for CONNUM C and CONNUM D, and provided incomplete weighted-average calculation worksheets for CONNUM A and CONNUM B.  Appx121.

### C.    Questionnaire Responses Relating to Other Issues

Chandan's questionnaire responses contained additional shortcomings.  One related to Chandan's reporting of gross unit price.  In response to a supplemental questionnaire, Chandan provided a calculation worksheet that reported its gross unit price net of "other discounts."  *See* Appx901-902, Appx903-905, and Appx923-925.

Commerce asked Chandan to revise its database to provide its gross unit price without deductions for discounts, rebates, or any other adjustment, and to provide documentation to substantiate its response. *See* Appx92. In response, Chandan stated that it "reported the gross unit price for all transactions without deducting any discounts or rebates." Appx92 (quoting Appx1664). However, Chandan failed to substantiate its response with any documentation. Appx92. Moreover, the database provided with this response indicated that Chandan did not make any adjustments to its reported gross unit price field. *See* Appx92.

Chandan's questionnaire responses were also insufficient with respect to quantity discounts. In its initial questionnaire response, Chandan stated that "quantity discounts are being reported against each invoice in the subsequent calendar year for which the customer has qualified {sic} the quantity discount conditions in the previous calendar year," and that it "ha{d} prepared a summary of the discounts allowed to its customers in {the comparison market} and allocated these discounts uniformly across the sales of all products sold to these customers." Appx200. In a supplemental questionnaire, Commerce asked Chandan for additional explanation and supporting information for its quantity discount reporting. *See* Appx92-93 (citing Appx881). However, Chandan's responses were unreliable and not presented in the manner in which Commerce requested. Appx93.

In addition to inadequate reporting of gross unit pricing and quantity discounts, Chandan also deficiently reported other discounts. Chandan claimed to report, as part

of other discounts, certain claims and debit notes. Appx94 (citing Appx200-201). In a supplemental questionnaire, Commerce asked Chandan to report these in a separate field, and to provide documentation to substantiate its response. *See* Appx94; *see also* Appx1663-1664. In response, Chandan stated that it was "reporting the other discounts against each invoice to which this billing adjustment relates," and that "{t}he revised values {were} reported in the comparison market database" in a separate field. Appx1664. However, Chandan provided no documentation to substantiate its response, and a comparison between the earlier and later versions of its comparison market database demonstrated that the other discounts field had not been adjusted, and that Chandan had not in fact reported a separate billing adjustments field. Appx94.

Finally, Chandan failed to support its reporting of a field relating to "U.S. duty refunds." Commerce requested that Chandan: (1) report the date of any such refund, (2) provide documentation of the refund, and (3) adjust its database to indicate that the refund was zero for any refunds not yet received. Appx94 (citing Appx1650). In response, Chandan stated that it had "updated the US sales database as instructed." Appx1671. However, a comparison revealed that Chandan did not update the database as requested, and supporting documentation was also lacking. Appx95.

### III. Commerce's Preliminary Results

#### A. Commerce Uses Facts Otherwise Available

In its preliminary results, Commerce found it appropriate, pursuant to

19 U.S.C. § 1677e(a), to use "facts otherwise available" in determining Chandan's

dumping margin for the period of review. *See* Appx87-95. Commerce's first reason

for using facts otherwise available was the deficiencies in Chandan's responses to the

agency's multiple requests for information regarding comparison market window

period sales. Appx88-89. Chandan had listed certain window period sales in an

intermediate version of its comparison market sales database, but the information was

so inaccurate as to be unusable. Appx89. The final version of the comparison market

sales database did not list window period sales for the full five-month period. *See*

Appx89. Commerce therefore concluded that necessary information was missing

from the record, within the meaning of 19 U.S.C. § 1677e(a)(1), because "Chandan

failed to report complete sales information in its comparison market database."

Appx89. Moreover, where Chandan had provided the requested information, it

"failed to report that data in the form or manner required," within the meaning of 19

U.S.C. § 1677e(a)(2)(B), "despite the fact that Commerce requested this information

on two separate occasions." Appx89. Finally with respect to window period sales,

Commerce found that Chandan had significantly impeded the proceeding, within the

meaning of § 1677e(a)(2)(C), by excluding the requested data from Chandan's most

recent comparison market database. Appx89. The requested information was

"critical to Commerce's price-to-price margin calculation, as the best {normal value} 'match' for U.S. sales may be comparison market sales in the window period." Appx89.

Commerce's preliminary decision to use facts otherwise available was also based on "pervasive reporting deficiencies relating to {Chandan's} assignment of costs at the CONNUM-specific level." Appx90. Commerce explained that it requires respondents to report costs on a CONNUM-specific basis because the agency "relies on such costs in applying the 'cost test' in the comparison market program and in {its} identification of 'identical' or 'similar' products (for price-to-price matching purposes) in the margin program." Appx89-90. After initially failing to adequately respond to Commerce's initial questionnaire, Chandan had provided product drawings for CONNUMs A and B, but "the figures contained in the product drawings {did} not match the figures reported in the cost database." Appx91. "These deficiencies relate{d} to the CONNUMs with the highest volumes of sales in each market, which were specifically sampled by Commerce as test cases for closer scrutiny." Appx91. The nature and extent of these errors in turn gave Commerce "no confidence in the accuracy of the reported costs for the remaining products." Appx91. These deficiencies, in combination with other reporting deficiencies in relation to CONNUM-specific costs, led Commerce to conclude that necessary information relating to CONNUM-specific costs was not available on the record, within the meaning of 19 U.S.C. § 1677e(a)(1). Appx91. Moreover, Commerce

concluded, Chandan had withheld information requested by Commerce, and provided inaccurate data, thereby substantially impeding the proceeding. Appx91-92. Thus, use of facts available was also warranted pursuant to § 1677e(a)(2)(A) and (C). Appx92.

After addressing Chandan's failings in the reporting of window period sales and CONNUM-specific costs, Commerce described additional deficiencies that Chandan had failed to remedy. Appx92-95. These included: (1) Chandan's reporting of its gross unit price, which was "not provided in the manner in which Commerce requested," Appx92; (2) the reporting of quantity discounts, which was unreliable due to Chandan's failure to actually make adjustments that were claimed to have occurred in its supplemental questionnaire responses, Appx92-93; (3) Chandan's responses in relation to other discounts, Appx94; and (4) Chandan's failure to update its database and provide supporting documentation in relation to claimed U.S. duty refunds. Appx94-95.

## B. Commerce Applies an Adverse Inference in Selecting From Among Facts Otherwise Available

Having preliminarily determined that resort to facts otherwise available was warranted, Commerce preliminarily determined that it would use an inference adverse to Chandan's interests in selecting from among facts otherwise available, pursuant to 19 U.S.C. § 1677e(b). Appx95-97. Commerce concluded that Chandan's reporting deficiencies demonstrated that Chandan had failed to cooperate by not acting to the

best of its ability in responding to Commerce's requests for information.  Appx96.

Despite having window period sales information in its possession, Chandan had failed

"to correct the deficiencies in {its} data and then to report the revised sales

information in its ultimate comparison market database."  Appx96.  Similarly, despite

having CONNUM-specific costs in its possession, Chandan had failed to provide

complete and accurate information, which "rendered its entire cost response

unusable."  Appx96.  And despite explicit requests from Commerce, Chandan failed

to correct its reported gross unit price, to revise or support its reporting of quantity

and other discounts, or to revise or support its reporting of duty refunds – all despite

the fact that, again, Chandan had the information in its possession.  Appx96.  These

deficiencies demonstrated that Chandan had failed to cooperate by acting to the best

of its ability.  Appx96.

     In addition to the above-referenced deficiencies, Commerce noted additional

indications that Chandan's reporting was inattentive and unreliable.  *See* Appx96.

Chandan's initial reporting of comparison market sales and costs excluded flanges

below a certain size despite those sizes being unequivocally included within the scope

of the order.  Appx96.  Chandan was also inconsistent in its assignment of products

to particular CONNUMs, and failed in several instances to provide explanations and

supporting documentation when requested.  Appx97.  These shortcomings occurred

despite Commerce granting Chandan numerous extensions of time, and the agency

issuing supplemental questionnaires to permit Chandan to correct its reporting.

Appx97. Finally, Commerce noted that Chandan was a large exporter with experience as a participant in the investigation. Appx97.

For all of these reasons, Commerce concluded that Chandan had failed to cooperate by not acting to the best of its ability; instead, "{t}he level of inattentiveness and inaccuracy of its reporting throughout {the} review undermine{d} the reliability of Chandan's responses" and warranted the application of an adverse inference in selecting from the facts otherwise available. Appx97.

## C. Commerce Preliminarily Determines a Rate of 145.25 Percent for Chandan

Commerce in its preliminary determination next addressed the adverse rate to be applied to Chandan. Commerce noted that its practice in selecting a rate based on adverse inferences is to use the higher of (1) the highest corroborated rate from the petition or (2) the highest calculated rate for any respondent from any segment of the proceeding, which Commerce is not required to corroborate, under 19 U.S.C. § 1677e(c)(2). Appx98-99. Commerce preliminarily assigned Chandan a dumping margin of 145.25 percent, which was the highest dumping margin calculated in the petition. Appx99. Moreover, because the rate was assigned to Bebitz Flanges Works Private Limited (Bebitz) in the investigation, Commerce was not required to corroborate that rate in this review. Appx99; *see* 19 U.S.C. § 1677e(c)(2). Commerce nonetheless noted that Bebitz's rate, which had been based on the petition rate, was corroborated in the investigation with reference to the transaction-specific dumping

margins of Chandan itself, which had been a mandatory respondent in the investigation.  Appx99.

## IV.  Commerce's Final Results

In its final results, Commerce made no changes to its preliminary results and assigned Chandan a dumping margin of 145.25 percent.  Appx155.  Commerce continued to find that Chandan's failure to fully report its comparison market sales supported the use of facts otherwise available.  Appx112-116.  Commerce also again concluded that Chandan failed to accurately report costs at the CONNUM level. Appx119-124.  Moreover, Chandan's responses contained additional deficiencies that Chandan failed to remedy, relating to gross unit price, quantity discounts, other discounts, and U.S. duty refunds.  Appx126-127.

With respect to the application of an adverse inference in selecting from among facts otherwise available, Commerce continued to find that Chandan had withheld requested information, failed to provide information in the form and manner requested, and significantly impeded the proceeding.  Appx130.  Thus, Commerce concluded, Chandan had failed to cooperate to the best of its ability, and the use of adverse inferences was warranted.  Appx130.  Commerce furthermore concluded that Chandan's deficiencies in sales and cost data were so fundamental and pervasive that it was appropriate to base Chandan's final dumping rate on total adverse facts available (total AFA), as opposed to partial application.  Appx130.

With respect to the rate, Commerce rejected Chandan's argument that the agency had not previously found a dumping margin close to the 145.25 percent rate. Appx137. To the contrary, Commerce noted, the agency had applied that rate in an earlier segment of the same proceeding, namely the investigation, applying an adverse inference with respect to facts available in calculating a dumping margin for Bebitz – a rate that in turn had been corroborated based on Chandan's own transaction-specific dumping margins. Appx137 (citing Appx99). Moreover, Commerce concluded, the 145.25 percent rate would be sufficiently adverse so as to effectuate the statutory purpose of inducing Chandan to provide Commerce with complete and accurate information in a timely manner, and ensuring that Chandan did not obtain a more favorable result through non-cooperation. Appx138.

## V. The Court of International Trade Sustains Commerce's Final Results as to Chandan

Chandan challenged Commerce's final results at the Court of International Trade. Chandan's case was consolidated with two cases filed by companies that were not individually examined in the administrative review. On December 8, 2023, the Court of International Trade issued an opinion in which it sustained Commerce's use of facts available with an adverse inference as to Chandan. Appx5-41.[1]

---

[1] The Court of International Trade struck down the rate assigned to consolidated plaintiffs that were not individually examined in the review. *See* Appx30-40. That aspect of the trial court's decision is not at issue in this appeal.

With respect to window period sales, the trial court rejected both Chandan's argument that there was no gap in information requiring the use of facts otherwise available, and Chandan's argument that Chandan had cooperated and acted to the best of its ability. *See* Appx22-23. The trial court furthermore disagreed with Chandan's assertion that the errors in its sales database were too minor or insufficient for adverse inferences. Instead, the court held, Chandan had not submitted reliable information prior to the preliminary results, and the agency was entitled to reject information that Chandan had later attempted to submit. Appx24.

The court concluded that it did not need to reach Chandan's challenge to the additional bases for Commerce's use of facts otherwise available with an adverse inference (that is, Chandan's reporting of its costs for production, and Chandan's reporting of gross unit price, quantity discounts, other discounts, and duty refunds). The court held that "{e}ven if the reporting errors claimed by Commerce to have occurred in these categories were nonexistent, minor, or inconsequential," as Chandan had argued, the court was "not able to presume that the omission of sales of smaller-size flanges occurring in window periods outside of the {period of review} could be so described." Appx26-27. Because "{a} reliable comparison market sales database for matching with a U.S. sales database is fundamental and essential for the Department's ability to calculate a weighted average dumping margin," the court held, the omission of such a reliable database "justified the use of facts otherwise available

17

as a total substitute for that database and, accordingly, for the assignment of a dumping margin." Appx27.

The Court of International Trade also upheld Commerce's selection of a 145.25 percent rate for Chandan. The court noted that this rate was drawn from a rate used in Commerce's investigation, which in turn was derived from the antidumping duty petition. Appx27-28. With reference to 19 U.S.C. § 1677e(d)(2), the court held that "Commerce must have discretion to choose a rate sufficiently adverse to create the incentive for the careful and timely responses to requests for information that are needed for the calculation of a weighted average dumping margin." Appx29.

Chandan moved for reconsideration, which the court denied. Appx42-57. Judgment was entered accordingly, Appx58, and this appeal followed.

## SUMMARY OF ARGUMENT

Commerce's use of facts otherwise available, applying an adverse inference in choosing from among those facts, is supported by substantial evidence and in accordance with law. Necessary information was missing from the record, rendering Chandan's entire sales and cost databases unusable. Moreover, Chandan failed to cooperate to the best of its ability in its responses to Commerce's requests for information. Commerce issued several supplemental questionnaires to Chandan describing omissions and deficiencies in Chandan's questionnaire responses, but Chandan continued to provide inconsistent and incomplete data, as well as incorrect

statements regarding its data corrections. Even with multiple opportunities and generous extensions of time, Chandan failed both to provide necessary information, and to correct inaccurate information.

On appeal, Chandan challenges only one of the three grounds for Commerce's application of total AFA: Chandan's failure to fully report window period sales. Chandan minimizes its reporting failures, but does not demonstrate a lack of substantial evidence for Commerce's finding that Chandan never submitted a complete and accurate comparison market sales database.

Indeed, Chandan's other shortcomings (as to Chandan's cost reporting and its reporting of gross unit price, quantity discounts, other discounts, and duty refunds) provide further support for Commerce's application of total AFA. The trial court found it unnecessary to reach these issues, because Chandan's deficient window period reporting, alone, sufficiently supported Commerce's resort to facts available with an adverse inference. But Commerce's conclusions as to these issues – unchallenged by Chandan – are also supported by substantial evidence.

Commerce's determination of the dumping margin is also supported by substantial evidence and otherwise lawful. Commerce selected the highest calculated rate from any segment in the proceeding, namely the petition-based rate applied to Bebitz in the investigation, which had been corroborated by Chandan's own transaction-specific dumping margins.

# ARGUMENT

## I. Standard of Review

This Court reviews *de novo* the Court of International Trade's judgments, reapplying the same statutory standard of review as that court. *Xi'an Metals*, 50 F.4th at 105. In reviewing Commerce's antidumping duty determinations, the trial court "must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (citation omitted). Further, even if the Court may draw two inconsistent conclusions from the record evidence, that possibility "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court

will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from them. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001).

## II. Commerce's Use of Facts Otherwise Available With an Adverse Inference Is Supported by Substantial Evidence and in Accordance With Law

### A. Legal Framework

Commerce "shall" use facts otherwise available to fill gaps in the record where either: (1) necessary information is not available; or (2) an interested party withholds information requested by Commerce, fails to provide the information by the deadline or in the manner requested, significantly impedes the proceedings, or provides information that cannot be verified. *See* 19 U.S.C. § 1677e(a). Furthermore, if Commerce finds that a respondent "failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce is permitted to apply an adverse inference in its selection of facts otherwise available. 19 U.S.C. § 1677e(b)(1). The statute does not require a minimum number of reporting deficiencies before Commerce may resort to facts otherwise available with an adverse inference. *See id.* § 1677e(b). Moreover, Commerce's authority to apply an adverse inference does not depend on the respondent's motivation or intent. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003).

A respondent fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Id.* The standard requires that exporters "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the {exports} in question to the full extent of the {exporters'} ability to do so." *Id.* In selecting information to rely on as an adverse inference, Commerce may rely on information from: (1) the petition, (2) the final determination in the investigation, (3) any previous administrative review, or (4) any other information placed on the record. *See* 19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c).

## B. Substantial Evidence Supports Commerce's Resort to Facts Available

Substantial evidence supports Commerce's use of facts otherwise available in determining Chandan's dumping margin. There is no reasonable dispute that Chandan failed both to include all window period sales in the comparison market sales database, and to adequately report CONNUM-specific costs. In addition, Chandan's reporting was deficient with respect to gross unit price, quantity discounts, other discounts, and duty refunds. Reliable information is crucial to Commerce's antidumping calculations, and yet Chandan withheld information requested by Commerce, failed to provide information in the form and manner requested, and significantly impeded the review, even after being offered several opportunities to correct its deficiencies.

1. **Chandan Failed to Report Comparison Market Window Period Sales**

As Commerce found and the trial court agreed, Chandan failed to fully report its window period sales, even after multiple requests from Commerce. In the initial questionnaire, Commerce provided the following instructions:

> {R}eport all sales of the foreign like product during the three months preceding the earliest month of U.S. sales, all months from the earliest to the latest month of U.S. sales, and the two months after the latest month of U.S. sales.

Appx3925. Thus, window period sales were plainly requested. Despite this, Chandan first reported only the comparison market sales from the period of review itself, with no window period sales. Appx88 (citing Appx220-233). Commerce again asked for window period sales, on August 19, 2020. Appx88. Chandan provided window period sales in the comparison market database submitted on September 11, 2020, but Commerce requested substantial revisions. *See* Appx89 (citing Appx1647-1648). In response, on December 9, 2020, Chandan submitted a comparison market database without including sales covering the full five months of the window period. Appx89. As Commerce stated, the omission of window period sales in the final database is significant, because the prior version, which did contain window period sales, was "so inaccurate as to be unusable." Appx89.

In its brief to this Court, Chandan attempts to evade the consequences of its own reporting. Chandan faults Commerce's statement that "because the comparison market database is missing the full five months of window period sales, we find it

significant that U.S. sales in the impacted months are *potentially* missing the best comparison market match." Applnt. Br. at 13, ECF No. 10 (quoting Appx113, with added emphasis). Chandan characterizes this as "speculation," which Chandan asserts "is not a lawful substitute for evidence and falls short of Commerce's obligation to base its determinations on substantial evidence." Applnt. Br. at 12 (citing *Risen Energy Co. v. United States*, 122 F.4th 1348, 1356 (Fed. Cir. 2024)).

But "{a}s the party in possession of the necessary information, the burden is on {Chandan} to develop the record, not Commerce." *Bebitz Flanges Works Priv. Ltd. v. United States*, 433 F. Supp. 3d 1297, 1306 (Ct. Int'l Trade 2020). Commerce indisputably asked for the information regarding window period sales. Chandan did not provide full and usable information, and Chandan cannot now complain that Commerce did not know the full scale of Chandan's failings.

Chandan next argues that its second revised database, submitted on December 9, 2020, "addressed issues that Commerce raised in its supplemental questionnaire." Applnt. Br. at 14.[2] But as Chandan concedes, "window period sales were not included in this second revised database." *Id.* at 15. Thus, as Commerce concluded, "Chandan once again submitted a comparison market database without including sales covering the full five-month window period." Appx89.

---

[2] Chandan incorrectly states that this submission was made on December 8, 2020. Applnt. Br. at 14.

Chandan also claims that "{t}here is no dispute that both databases covered sales during the entire period of review (March 28, 2018 to September 30, 2019) for all flanges within the scope of the antidumping Order (0.5 inch to 24 inch)." Applnt. Br. at 14 (citing Appx1661). The only comparison market database discussed at the cited page of the joint appendix is CSLAR1HM03, which was submitted on December 9, 2020. Appx1661. The citation therefore does not support Chandan's assertion regarding both databases. More to the point, Commerce questioned the sufficiency of Chandan's reporting not based on whether the final comparison market database included all sales *within* the period of review, but rather on whether Chandan included window period sales outside the period of review. As to that question, Chandan in the second revised database undisputedly did not include sales covering the full five-month window period. Appx89.

Chandan similarly asserts that Commerce "wholly speculated, without any support including in logic, that the absence of the window sales three months before the {period of review} and two months after the {period of review} meant that information might be missing." Applnt. Br. at 16. But, again, there is no question that information *is missing*, namely a full set of window period sales. Commerce did not merely "assume that there is a gap in the record." *Id.* at 16 (citing *Risen Energy*, 122 F.4th at 1356). Moreover, as Commerce found, "these arguments rely on creating a consolidated comparison market database in the manner proposed by Chandan, which does not result in a complete or accurate database." Appx113. "Thus, while it

may be possible that {U.S.} sales can find an alternative match in the comparison market database, it is not necessarily the case that the match would have been the best match available and yield accurate results." Appx113-114.

As the trial court explained, Chandan is "misguided" in its argument that any errors in the comparison market database were too minor or insufficient for adverse inferences, and did not prevent Commerce from using the database with allowances or adjustments:

> Commerce must be able to obtain from cooperative respondents, on a timely basis, a reliable comparison market database in order to calculate a weighted average dumping margin. As of the time it issued the Preliminary Results, {Commerce} still lacked reporting of sales of Chandan's smaller-sized flanges that occurred outside the {period of review}, which sales were unavailable for comparison with U.S. sales.

Appx24.[3]

The court reiterated this conclusion in denying Chandan's motion for reconsideration. The court held that, even assuming that Chandan had correctly calculated "that missing comparison market sales would not have affected the individual margin calculations for 99.6% of its U.S. sales," Commerce still was not

---

[3] Before the Court of International Trade, Chandan also asserted that Commerce erred by refusing to accept a version of the comparison market database that Chandan attempted to submit on March 16, 2021, after Commerce issued its preliminary results. *See* Appx20. The trial court rejected this argument, Appx20, and Chandan on appeal does not challenge Commerce's rejection of that untimely submission.

required "to use the December 9, 2020 sales database, any part of it, or any other information on the record, to calculate a dumping margin for Chandan." Appx52-53. That was so because "substantial evidence supported the Department's finding that Chandan did not act to the best of its ability in submitting the comparison market sales database." Appx53. The court observed that, while 19 U.S.C. § 1677m(e) provides that Commerce shall not decline to consider information even if it does not meet all applicable requirements, that requirement only applies where the interested party has demonstrated that it acted to the best of its ability. Appx53 (citing 19 U.S.C. § 1677m(e)(4)). Because Chandan failed to cooperate by acting to the best of its ability, the trial court correctly reasoned, Commerce was under no obligation to attempt to use the faulty December 9, 2020 comparison market sales database. Appx53-54.

The court on reconsideration furthermore confirmed that Commerce may use facts otherwise available not only where necessary information is not available on the record, but also where an interested party, such as Chandan, fails to provide such information "*in the form and manner requested*." Appx55 (quoting with added emphasis 19 U.S.C. § 1677e(a)(2)(B)). The trial court noted that Commerce had "made a factual finding that Chandan's resubmitted, and still incomplete, 'comparison market database' was not reported 'in the form or manner required, within the meaning of {19 U.S.C. § 1677e(a)(2)(B)}.'" Appx55 (quoting Appx116). Based on the record, the

court could not conclude that Commerce's findings were unsupported by substantial

evidence or that Commerce otherwise acted contrary to law.  Appx55-56.

This Court should similarly sustain Commerce's rejection of Chandan's

comparison market database, given the deficiencies in Chandan's reporting.  The

correctness of that outcome is unaffected by Chandan's assertion that "a mere 0.38

percent of all U.S. sales were missing to calculate a dumping margin as to those sales."

Applnt. Br. at 18.  Chandan can make this assertion only by combining the earlier

CSLHM03 database, submitted on September 11, 2020, and the later CSLHMR03

database, submitted on December 9, 2020.[4]  That attempted combination does not

assist Chandan, however, because Commerce concluded that "compiling data from

the various sources still does not yield a usable database."  Appx113.  Commerce

reached this conclusion because CSLHM03 was "not accurate," and Commerce's

requested adjustments to that earlier database "would have impacted the sales

reporting . . . and, therefore, the data are not correct."  Appx113.  Moreover,

Chandan's failure to report products with a nominal pipe size of 0.5 inches to less

than 1.5 inches in CSLHM03 "meant that the window period sales are incomplete" in

---

[4]  That Chandan's numbers are based on combining unreliable databases is
shown by Chandan's citation, because Chandan supports its claim of insignificance by
citing its own case brief in the administrative review.  *See* Applnt. Br. at 18 (citing
Appx3766).  And Chandan admitted to the trial court that the analysis at that page of
its case brief comes from "combining record databases CSLHM03 and
CSLAR1HM03."  Appx6660; *see also* Appx51 (trial court notes that Chandan's analysis
is based on combining databases).

that database.  Appx113.  Therefore, consolidating CSLHM03 and the later

CSLAR1HM03 "would not provide a complete and accurate comparison market

database."  Appx113.

As noted above, the trial court accepted Commerce's finding, and held that,

even assuming Chandan "correctly calculated that missing comparison market sales

would not have affected the individual margin calculations for 99.6% of its U.S.

sales," Chandan's failure to provide information in the form and manner requested

justified the resort to facts otherwise available.  Appx52.  Substantial evidence

therefore supports Commerce's finding that Chandan failed to submit the comparison

market database in the form and manner requested.  Appx56.

Finally with respect to Chandan's argumentation on window period sales,

Chandan is simply incorrect in claiming that "{u}ltimately, Commerce applied total

adverse facts available because comparison sales representing a mere 0.38 percent of

all U.S. sales were missing to calculate a dumping margin as to those sales."  Applnt.

Br. at 18.  Commerce concluded that Chandan's deficient reporting of window period

sales rendered its entire comparison market database unusable.  And importantly, we

explain in the following sections that the inadequacy of the comparison market

database was only one of several reasons why Commerce assigned Chandan a rate

based on total AFA.

### 2. Chandan Failed to Accurately Report Costs at the CONNUM-Specific Level

In addition to submitting an unreliable comparison market database, Chandan also failed to accurately report costs at the CONNUM level, and there were inconsistencies in Chandan's cost-reporting methodology. *See* Appx116-124. The trial court did not reach these issues, holding instead that Chandan's failures in reporting window period sales sufficiently justified Commerce's resort to total adverse facts available. Appx26-27.

Chandan in its opening brief does not discuss Commerce's decision as to these additional reporting issues, much less does Chandan demonstrate any error in Commerce's determination as to these issues. But the full scope of Commerce's conclusions support affirmance and this Court may address those bases, "because the argument{s} {were} raised below and {are} supported by the record." *Thomson Multimedia Inc. v. United States*, 340 F.3d 1355, 1360 n.3 (Fed. Cir. 2003) (citing *Dandridge v. Williams*, 397 U.S. 471, 475 n. 6 (1970)). We demonstrate in this section and the next that Commerce's conclusions as to these issues are supported by substantial evidence and are otherwise lawful.

With respect to cost reporting, Commerce preliminarily found the following issues: (1) discrepancies with the product drawings for the majority of products comprising CONNUM A and CONNUM B, *i.e.*, the CONNUMs with the highest volume of sales in each market, leading Commerce to conclude that Chandan did not

follow its claimed approach to assign raw material costs; and (2) failure by Chandan to provide calculation worksheets for CONNUM C and CONNUM D, and incomplete weighted-average calculation worksheets for CONNUM A and CONNUM B. *See* Appx117.

In the final results, Commerce continued to find that Chandan failed to report costs at the CONNUM-specific level, which supported the use of facts otherwise available, with an adverse inference. Appx119. In reaching this conclusion, Commerce reiterated that it "requires accurate and complete information pertaining to a respondent's cost of producing the merchandise under consideration." Appx119. As part of its analysis, "Commerce examines and confirms not only that the aggregate pool of costs attributed to the merchandise under consideration is accurate and complete, but also that the costs of production are reasonably and accurately allocated to individual CONNUMs." Appx120-121.

Here, "{b}ecause Chandan's reported per-unit cost data {were} inaccurate and unreliable" Commerce could not "conduct an accurate cost test," and therefore was "unable to determine, with confidence, whether Chandan's comparison market sales were made within the ordinary course of trade." Appx120. Moreover, Commerce concluded, "Chandan's cost reporting failures have key implications for {the agency's} margin analysis." Appx120.

In the final results, Commerce rejected Chandan's claim that its data was reliable. An exhibit on which Chandan relied, Exhibit CB-8, did not contain

information needed to demonstrate that Chandan's reporting was accurate.  Appx120.

Resubmitted exhibits contained discrepancies that carried over from earlier versions.

Appx120-121.  Chandan also did not provide weighted-average calculation worksheets

for CONNUM C and CONNUM D, and provided incomplete weighted-average

calculation worksheets for CONNUM A and CONNUM B.  "Specifically, Chandan

showed the individual product cost per unit calculation for some of the products that

make up the CONNUM, but it did not demonstrate how it calculated the CONNUM

weighted-average cost," and there were discrepancies in the number of products

comprising these CONNUMs.  See Appx121-122.  Chandan "failed to provide an

accurate explanation and supporting documentation to substantiate its cost of raw

material allocation."  Appx123.  Chandan also failed to provide cost build-ups in the

manner requested after two separate requests, despite understanding Commerce's

request that it do so.  Appx123.[5]  And Chandan failed to support its assertion that

products whose production was based on a technical drawing "could have different-

than-reported theoretical weights due to tolerances and/or 'other technical

parameters.'"  Appx123.

---

[5] Cost build-ups are a set of worksheets and supporting documents that demonstrate how source information from the accounting records was compiled and allocated between products, which is critical in demonstrating that reported costs fairly reflect cost of production.  Appx123.

For these and other reasons, Appx123-124, "Chandan failed to provide accurate and consistent responses to specific questions." Appx124. Thus, necessary information was not available on the record, and Commerce continued to find that facts available were warranted in accordance with 19 U.S.C. § 1677e(a)(1). Further, Commerce found that Chandan withheld information that was requested by Commerce, and it provided inaccurate data in the review, thereby substantially impeding the proceeding. Appx124. Thus, Commerce "continue{d} to find that facts available are also warranted in accordance with {19 U.S.C. §§ 1677e(a)(2)(A) and (C)}." Appx124.

Chandan never addresses these findings. But even if Chandan had offered some challenge to Commerce's reasoning, the record plainly demonstrates that Chandan was asked multiple times to correct issues in its cost reporting, yet failed to do so, such that its cost information was unreliable. Commerce was amply justified in resorting to facts otherwise available.

### 3. Chandan Failed to Correct Other Deficiencies

Chandan also does not challenge Commerce's conclusion that Chandan's failure to correct other deficiencies in its reporting also warranted the use of facts otherwise available, but Commerce's lawful conclusions on these issues support its ultimate decision in the review. In the preliminary results, Commerce found that Chandan's responses contained additional deficiencies relating to its reporting of gross unit price, quantity discounts, other discounts, and duty refunds. *See* Appx124; *see also*

Appx92-95.  In the final results, Commerce continued to find that "Chandan failed to provide necessary information on a timely basis and in the form and manner requested, and it provided misleading and inaccurate information, significantly impeding {the} proceeding."  Appx126.

In reaching this conclusion, Commerce noted Chandan's observations, in response to the preliminary results, that Commerce could correct Chandan's reporting.  Appx126.  Commerce agreed that this could be done, and that these reporting deficiencies "taken individually, would not warrant application of total AFA."  Appx126.  But Commerce disagreed that it would be appropriate to examine each deficiency in isolation, because there were "a number of significant issues that, taken together, render Chandan's data unusable."  Appx126.  Moreover, Commerce found it significant that Chandan in several instances represented that the deficiencies had been addressed when, in fact, they had not.  Appx126.

## C. Commerce's Decision to Use an Adverse Inference Is Supported by Substantial Evidence and in Accordance With Law

For the reasons set forth in the preceding sections, substantial evidence supports Commerce's finding of deficiencies relating to window period sales, CONNUM-specific costs, and other aspects of Chandan's reporting.  Thus, Commerce's use of facts otherwise available was warranted pursuant to 19 U.S.C. § 1677e(a).

Commerce furthermore reasonably determined that Chandan failed to cooperate by not acting to the best of its ability to comply with Commerce's requests for information, making it appropriate to use an adverse inference in selecting from among the facts otherwise available, pursuant to 19 U.S.C. § 1677e(b). "Compliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel*, 337 F.3d at 1382. As relevant to the facts of this record, "an adverse inference may be appropriate where an interested party has been notified of a defect in its questionnaire response yet continues to provide a defective response." *Hyundai Electric & Energy Systems Co., Ltd. v. United States*, 15 F.4th 1078, 1090 (Fed. Cir. 2021) (citing *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017)).

The multiple indications of Chandan's inattentiveness more than sufficiently demonstrate that Chandan did not put forth maximum effort. Chandan had window period sales information in its possession, as evidenced by its questionnaire response dated September 11, 2020, but it failed to correct data deficiencies and report the revised sales information in its final comparison market sales database. Appx131. Chandan also failed to provide complete and accurate CONNUM-specific costs, again despite having this information within its possession. Appx131. Chandan reported costs that did not match the underlying product drawings that Chandan identified as the basis for its reporting, and failed to explain the discrepancies. And Chandan failed

to correct its reported gross unit price and to revise or support its reporting of its discounts and duty refunds, despite possessing this information and Commerce's requests that Chandan do so. *See* Appx131.

The Court of International Trade concluded that Chandan's failure to report window period sales, standing alone, justified the imposition of an adverse inference. Appx26-27. That conclusion is correct, but Commerce's use of an adverse inference was not only based on reporting of window period sales. There were many mistakes, illustrative of "pervasive{} . . . inattentiveness and/or carelessness." Appx132. Also, Chandan provided unhelpful responses to Commerce's follow-up requests. Appx132. And these shortcomings occurred despite Commerce granting numerous extensions. Appx133.

Taken as a whole and as stated by Commerce, "{t}his does not reflect the behavior of a party who is cooperating to the best of its ability." Appx131. "Therefore, an adverse inference is warranted (*i.e.*, the application of total AFA), pursuant to {19 U.S.C. § 1677e(b)}." Appx131. This application of an adverse inference is amply supported by precedent. *See Mukand, Ltd. v. United States*, 767 F.3d 1300, 1306-08 (Fed. Cir. 2014) (respondent did not act to the best of its ability where Commerce requested information on five separate occasions but respondent still failed to produce); *see also Nippon Steel*, 337 F.3d at 1382 (holding that the "best of its ability" standard "does not condone inattentiveness, carelessness, or inadequate record keeping").

36

Moreover, Commerce was warranted in applying total, as opposed to partial, adverse facts available due to the comprehensive deficiencies of Chandan's reporting. "In general, use of partial facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1357 (Fed. Cir. 2015) (quoting *Mukand,* 767 F.3d at 1308). Indeed, this Court has twice held that failure to report accurate CONNUM-specific cost data, standing alone, will support application of total adverse facts available. *See Xi'an Metals*, 50 F.4th at 108; *Mukand*, 767 F.3d at 1307. And, of course, CONNUM-specific reporting is only one of the deficiencies found here by Commerce.

Chandan ignores this precedent, asserting instead that "{t}his Court . . . rejects Commerce's use of total adverse facts available where usable information is in the record or the gap created by missing information is small." Applnt. Br. at 19 (citing *Hyundai Elec. & Energy Sys. v. United States*, No. 2021-2312, 2022 WL 3273811, at *4 (Fed. Cir. Aug. 11, 2022); *Diamond Sawblades Mfrs. Coal. v. United States,* 986 F.3d 1351 (Fed. 2021); and *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011)).

Those cases are inapposite. As the CIT stated with respect to *Diamond Sawblades*, this Court in that case held that the agency's finding that the submitter of information failed to provide information "in the form and manner requested" was

unsupported by substantial evidence. This Court noted, further, that the submitter was not found to have missed any deadline for the submission of requested information. Appx56 (citing *Diamond Sawblades*, 986 F.3d at 1363). In this case, in contrast, substantial evidence demonstrates that Chandan did fail to provide information in the form and manner requested, in addition to other shortcomings, and that Chandan did not act to the best of its ability. Similarly, in *Hyundai*, Commerce had concluded that using the respondent's data did *not* cause undue difficulties. *See* 2022 WL 3273811, at *4. This Court therefore affirmed Commerce's determination that an adverse inference was unwarranted. *See id.* Here, as reflected by Commerce's finding with respect to Chandan's window period reporting, "the current record information is incomplete and cannot be used without undue difficulties." Appx116. And window period reporting was only one reason for the application of total AFA.

*Zhejiang* also has no force here. On the fact of that case, the Court found that it was possible to calculate the dumping margin without the sales quantities missing from the record, such that application of partial AFA was unwarranted. *See* 652 F.3d at 1347. The Court expressly distinguished those facts from scenarios involving application of total facts available, which allows Commerce to "ignore all data submitted where the bulk of it is determined to be flawed and unverifiable." *Id.* at 1348 (citing *Steel Authority of India, Ltd. v. United States,* 149 F.Supp.2d 921, 928-29 (Ct. Int'l Trade 2001)).

Chandan therefore cannot succeed in its assertion that, at most, any application of facts otherwise should be limited to U.S. sales for which an appropriate comparison sale could not be located in the sales databases. *See* Applnt. Br. at 19. As held by the Court of International Trade, an adverse inference is warranted based on the flaws in the comparison market sales database. But even if the Court disagrees with that holding, Chandan's argument on appeal ignores the majority of Commerce's findings and conclusions regarding the pervasiveness of Chandan's deficiencies, and so Chandan provides the Court with no reason to disturb the agency's conclusion that the totality of the facts warranted the use of an adverse inference.

## III. Commerce's Use of a Rate From a Prior Segment of the Proceeding Is Supported by Substantial Evidence and in Accordance With Law

Where Commerce decides to use an adverse inference, the agency is permitted to "use any dumping margin from any segment of the proceeding under the applicable antidumping order." 19 U.S.C. § 1677e(d)(1)(B). Commerce's application of a rate in such circumstances, including the application of the highest such rate, may be based on the agency's evaluation of the situation that resulted in it using an adverse inference. *Id.* § 1677e(d)(2). When selecting an adverse rate from among the possible sources, Commerce seeks to use a rate that is sufficiently adverse to effectuate the statutory purpose of inducing respondents to provide Commerce with complete and accurate information in a timely manner. *See Ozdemir Boru San. Ve Tic. Ltd. v. United States*, 273 F. Supp. 3d 1225, 1245 (Ct. Int'l Trade 2017) (citation omitted). This

ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Statement of Administrative Action, H.R. Rep. No. 103-316 (1994), at 870, *reprinted at* 1994 U.S.C.C.A.N. 4040.

Chandan asserts that Commerce unlawfully assigned to Chandan the highest dumping margin calculated in the petition, namely 145.25 percent. Applnt. Br. at 20. Chandan concedes that Commerce is "grant{ed} . . . discretion to select as an adverse rate any dumping margin from any segment of the proceeding." *Id.* Yet Chandan asserts that the discretion was abused here, because "{d}uring the investigation, Commerce calculated and verified a dumping margin for Chandan of 19.16 percent," *id.* at 20, and a rate of 145.25 percent "is highly implausible (not credible) as an accurate figure for Chandan's dumping margin for the 2018-2019 review period." *Id.* at 21.

This assertion is refuted by the Tariff Act itself, which provides that, where an interested party has failed to cooperate by not acting to the best of its ability, Commerce "is not required to determine, or make any adjustments to, a . . . weighted average dumping margin based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information." 19 U.S.C. § 1677e(b)(1)(B). Moreover, Commerce may use a dumping margin from any segment of the proceeding under the applicable order, including the petition. *Id.* § 1677e(d)(1)(B). Commerce is not required to estimate what the margin would have been if the interested party had cooperated, or to demonstrate that the

margin used "reflects an alleged commercial reality of the interested party." *Id.*

§ 1677e(d)(3)(A)-(B). Chandan fails to acknowledge this statutory authority, much

less does Chandan demonstrate that the margin is "punitive," or that it was

unsupported by substantial evidence or otherwise unlawful. Applnt. Br. at 21.

Commerce previously assigned this petition-based rate to an uncooperative

respondent in the investigation leading to the order, namely the "Bebitz/Viraj single

entity." Appx137. And that rate, based on an adverse inference in selecting from

among facts otherwise available, was corroborated in the less-than-fair-value

investigation with reference to Chandan's calculated margin in the investigation.

Appx137. Specifically, Commerce compared the 145.25 percent petition rate to the

transaction-specific dumping margins for Chandan, and found product-specific

margins at the petition rate. Appx137. In other words, the 145.25 percent rate had

been corroborated in the investigation using *Chandan's own* product-specific margins.

In particular, the use of such transaction-specific rates may sufficiently corroborate an

AFA rate when such data was obtained from the non-cooperating party. *See*

*Papierfabrik August Koehler Se v. United States*, 843 F.3d 1373, 1380-82 (Fed. Cir. 2016);

*PAM S.P.A. v. United States*, 582 F.3d 1336, 1340 (Fed. Cir. 2009); *Ta Chen Stainless*

*Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002).

Finally, although Chandan asserts that "Commerce made no effort to justify

this rate as being limited to what is needed to deter non-compliance," Applnt. Br. at

21, that statement is untrue. Commerce explained that its general practice is to ensure

that the margin is sufficiently adverse to effectuate the statutory purpose of inducing the respondent to provide complete and accurate information in a timely manner. Appx138. Although Chandan had advocated for a rate previously assigned under a different antidumping duty order, Commerce found that that proposed rate would not ensure that the margin was sufficiently adverse for purposes of this proceeding; "nor would it ensure that Chandan does not obtain a more favorable result by failing to cooperate than if it had fully cooperated." Appx138. By contrast, the corroborated petition rate met that criteria. Appx138. The Court should affirm Commerce's application of the 145.25 percent rate.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the judgment of the Court of International Trade.

Respectfully submitted,

YAAKOV M. ROTH
 *Acting Assistant Attorney General*

PATRICIA M. McCARTHY
 *Director*

 */s/ Tara K. Hogan*
_____
TARA K. HOGAN
 *Assistant Director*


 */s/ Geoffrey M. Long*
_____
GEOFFREY M. LONG
 *Acting Assistant Director*
 *Commercial Litigation Branch*
 *Civil Division, U.S. Department of Justice*
 *P.O. Box 480, Ben Franklin Station*
 *Washington, DC 20044*
 *(202) 307-0159*
 *Geoffrey.M.Long@usdoj.gov*

May 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Circuit Rule 32(b)(1) because it contains 9,603 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Geoffrey M. Long*
Geoffrey M. Long